*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

BRANDILYN WILKINSON,

        Plaintiff-Appellant,

v

LIFE EMS AMBULANCE,

        Defendant-Appellee.

UNPUBLISHED
January 17, 2019

No. 342287
Kalamazoo Circuit Court
LC No. 2016-000565-CD

Before: MARKEY, P.J., and M. J. KELLY and SWARTZLE, JJ.

PER CURIAM.

Plaintiff, Brandilyn Wilkinson, appeals as of right the trial court's order granting summary disposition in favor of plaintiff's former employer, defendant Life EMS Ambulance, pursuant to MCR 2.116(C)(10). We affirm.

Plaintiff began her employment as a paramedic with defendant in April 2015. Defendant presented evidence that plaintiff had been fired on four previous occasions by other employers. A director of operations for defendant averred that "[n]obody at Life EMS was aware of the full extent of her employment history when we hired [her, and we] did not have a complete picture of why she was fired from previous employers." He further averred that plaintiff's "employment application . . . omitted some of the EMS providers where she was terminated from or left on poor terms." Defendant presented additional evidence showing that, during plaintiff's employment, there were several documented incidents in which she became embroiled in conflicts with her coworkers and engaged in the questionable administration of medications. The director of operations indicated as follows:

> [Plaintiff] has a very difficult personality where she will not admit fault or take direction about areas where she needs to improve. She also had a perception of herself as a paramedic that far exceeded reality, and she tended to have an over-aggressive, cavalier approach to medicating patients (particularly as it relates to sedatives or pain medications).

In February 2016, defendant implemented a new policy concerning the proper administration of medications which was called the medication administration cross-check (MACC) policy, entailing four specific steps employed by at least two paramedics.

On February 25, 2016, plaintiff suffered a sprained knee while treating a patient in the back of an ambulance when it was moving and then suddenly stopped. Subsequently, plaintiff applied for and received workers' compensation benefits. In May 2016, plaintiff's physician indicated that she could participate in restricted duty at work which limited her to a position where she could primarily sit. Defendant found plaintiff a temporary administrative position in Grand Rapids; however, plaintiff obtained a note from her physician that precluded her from driving to Grand Rapids. In June 2016, defendant offered plaintiff a restricted-duty position in Kalamazoo, which she accepted, but plaintiff only worked in the position for a couple of days before once again obtaining a doctor's note taking her off the job. Plaintiff, who had been pregnant at the time she sustained the knee injury, gave birth to her daughter in July 2016.

On August 11, 2016, plaintiff presented defendant with a notice of claim for first-party no-fault insurance benefits related to the knee injury suffered in the ambulance. In September 2016, plaintiff's treating physician suggested surgery for the knee, while also providing permission for plaintiff to return to work with various physical restrictions during the interim. Also in September 2016, at the behest of defendant's insurer, an independent medical examination (IME) was completed; the IME physician did not believe that knee surgery was necessary. The IME doctor concluded that there were "no abnormal physical findings except subjective exaggerated pain." The IME physician opined that plaintiff could "return to full unrestricted duty." On the basis of the IME, plaintiff's workers' compensation benefits were discontinued. On October 6, 2016, plaintiff applied for a personal leave of absence from defendant so that she could have knee surgery.

On October 11, 2016, plaintiff filed a petition for mediation or hearing with the workers' compensation bureau, challenging the decision to discontinue her benefits. Defendant's having approved plaintiff's request for a leave of absence, plaintiff underwent surgery on her knee on October 13, 2016. On October 31, 2016, the workers' compensation bureau sent a notice to defendant, informing it that plaintiff had filed a petition for mediation or hearing regarding the discontinuation of her workers' compensation benefits. A hearing on the matter was scheduled for December 6, 2016. On November 9, 2016, plaintiff returned to work. On the following day she was paid the no-fault insurance benefits that she had requested. Upon plaintiff's return to her job, defendant required her to work with a field training instructor, Jared Spallina, to reorient her to the job and familiarize her with respect to current policies, such as the MACC. On November 18, 2016, defendant apparently recommended that plaintiff return to full Level 2 paramedic status, even though defendant's paramedic supervisor had concerns about plaintiff.[1]

During an ambulance run on November 21, 2016, an incident occurred during which plaintiff administered a sedative to a heart attack patient with low blood pressure, allegedly

---

[1] Those concerns included plaintiff's purported inadequate knowledge of physiology, over-confidence in her skills, lack of protocol compliance, and her alleged abrasive personality.

violating the MACC policy and endangering the patient's life. We will discuss this incident in more detail below. As a result and on the same day of the incident, defendant suspended plaintiff without pay. On November 23, 2016, defendant sought review of the incident by the Kalamazoo County Medical Control Authority (KCMCA).[2] A week later, on November 30, 2016, plaintiff's employment was terminated.

With respect to the incident on November 21, 2016, which formed the basis for termination, defendant issued the following notice to plaintiff:

> Brandilyn, patient safety is critical to the operation of Life EMS. Your verbal statement to Life EMS leadership on 11/23/2016 indicated that you directly informed Jared [Spallina] that you were administering Versed to the patient and that he was standing "right next to" you when you administered it. Your electronic patient care record indicates that a formal medication cross check procedure was done with Jared prior to the administration of the Versed.

> During the course of the investigation which included in-person interviews, formal written statements, audio recording review, quality improvement screening, and a medical control debriefing, it was concluded that contrary to your statement, you did not directly inform Jared that you were administering Versed to the patient and you falsely documented, within your electronic patient care record, that a formal medication cross-check took place with your Field Trainer, Jared. Further, you failed to verbally communicate that you had administered a sedative medication with the potential to cause profound complications including respiratory depression and hypotension to an acutely ill patient, which created a clear patient safety concern.

> The falsification of patient care information is a direct violation of Life EMS policies #301 and #310. In consideration of the severity of this incident, your failure to appropriately respond to leadership counseling, and your continued dishonesty when questioned about the medication cross check, Life EMS has determined to separate employment with you effective immediately.

On December 19, 2016, plaintiff filed a two-count complaint against defendant, alleging a violation of the Worker's Disability Compensation Act (WDCA), MCL 418.101 *et seq*., based on retaliatory discharge under MCL 418.301(13), along with a claim that defendant violated public policy by discharging her for having requested no-fault insurance benefits. Defendant filed a motion for summary disposition under MCR 2.116(C)(10), arguing that both of plaintiff's retaliation claims failed as a matter of law because she could not establish causation and because she could not prove that the legitimate, nonretaliatory reasons for her discharge were pretextual.

---

[2] Ultimately, no sanctions were imposed by the KCMCA against plaintiff's license. There was legal wrangling below regarding whether KCMCA-related testimony was protected by Michigan's peer-review privilege. We shall further discuss this matter later in the opinion.

Defendant further contended that the no-fault retaliation claim also failed because it is not a recognizable claim under Michigan law.

Ruling from the bench, the trial court stated that plaintiff's arguments might very well support a prima facie case of retaliation, giving rise to an inference of a causal connection between protected activity and the discharge. The court determined, however, that if plaintiff proved a prima facie case, defendant presented legitimate reasons for terminating plaintiff's employment, i.e., violation of the MACC policy and falsifying the patient care report. The trial court rejected plaintiff's argument that she was exonerated by the KCMCA in regard to her conduct since the evidence only showed that plaintiff did not lose her paramedic's license. The court explained that the KCMCA was not concerned with whether plaintiff did her job according to the rules and protocols established by defendant for its employees. The trial court concluded that defendant offered legitimate, nonretaliatory reasons for the termination and that plaintiff failed to submit evidence showing that the reasons were pretextual. The court ruled that plaintiff failed to present sufficient evidence demonstrating that her participation in protected activity was a motivating factor for her discharge. Accordingly, plaintiff's WDCA claim failed. With respect to the retaliation claim premised on plaintiff's request for no-fault benefits, the trial court found that it was not a cognizable claim under Michigan law. Moreover, according to the court, even if such a claim existed, it failed for the same reasons that the WDCA claim failed. The trial court subsequently entered an order granting defendant's motion for summary disposition. And the court denied plaintiff's motion for reconsideration. Plaintiff appealed as of right.

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Hoffner v Lanctoe*, 492 Mich 450, 459; 821 NW2d 88 (2012). In *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), this Court set forth the principles governing a motion for summary disposition brought pursuant to MCR 2.116(C)(10), observing:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

"Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994); see also *Dextrom v Wexford Co*, 287

Mich App 406, 415; 789 NW2d 211 (2010) (a court must draw all reasonable inferences in favor of the nonmoving party).

Plaintiff argues that the trial court improperly made conclusions as to disputed facts and failed to view the evidence in a light most favorable to plaintiff. Plaintiff further maintains that she established a prima facie case of retaliatory discharge under the WDCA. Finally, plaintiff contends that she stated a cognizable cause of action for retaliatory termination based on the requested payment of no-fault insurance benefits.

With respect to the WDCA, MCL 418.301(13), provides:

> A person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

In *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 275; 826 NW2d 519 (2012), this Court observed:

> To establish a prima facie case of retaliation under the WDCA, an employee who has suffered a work-related injury must present evidence: (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected.

In the instant case, the first three elements are not in dispute, but the parties disagree in regard to the existence of a causal connection between plaintiff's exercise of a WDCA right and her discharge from employment. It appears that the trial court, in analyzing the case for purposes of summary disposition, proceeded on the assumption that plaintiff had established a prima facie case, encompassing all four elements. With respect to causation, the panel in *Cuddington*, 298 Mich App at 275-276, explained:

> The last element, causation, is usually difficult to prove. Under some circumstances, a plaintiff may be able to produce direct evidence of retaliatory animus. In employment discrimination cases, our Supreme Court has defined "direct evidence" as evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. In the retaliation context, direct evidence of retaliation establishes without resort to an inference that an employer's decision to take an adverse employment action was at least in part retaliatory.
>
> Rarely will an employer openly admit having fired a worker in retaliation for exercising a right of employment. . . . When a plaintiff presents circumstantial rather than direct evidence of an employer's retaliatory motive, we examine the

claim under the *McDonnell Douglas/Burdine*[3] burden-shifting framework. [Citations and quotation marks omitted.]

Here, there was no direct evidence of retaliation by defendant; therefore, plaintiff was forced to proceed on the basis of circumstantial evidence and the employment of the burden-shifting framework. In *Cuddington*, 298 Mich App at 276-277, this Court discussed the framework:

> Under the *McDonnell Douglas/Burdine* analysis, when a plaintiff asserting a claim for retaliatory discharge under MCL 418.301(13) circumstantially establishes a rebuttable prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its adverse employment action. If the defendant produces a legitimate, nondiscriminatory reason for its action, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor for the adverse action taken by the employer toward the plaintiff. A plaintiff can establish that the employer's proffered reasons for the adverse employment action qualify as pretextual by demonstrating that the reasons (1) had no basis in fact, (2) were not the actual factors motivating the decision, or (3) were insufficient to justify the decision. [Quotation marks and citations omitted; alteration in original.]

The trial court found that defendant had articulated legitimate, nonretaliatory reasons for the discharge and that, as a matter of law, plaintiff failed to demonstrate that retaliation was a motivating factor for the termination or, stated otherwise, that the reasons defendant proffered were pretextual.

Plaintiff initially argues that the trial court improperly reached conclusions as to disputed facts and failed to view the evidence in a light most favorable to plaintiff. More specifically, plaintiff contends that the trial court failed to give any weight to the fact that the KCMCA took no action against plaintiff's license on review of the November 21, 2016 incident; there were no adverse consequences from the KCMCA investigation. Plaintiff asserts that she was terminated solely on the basis of falsification of records, which is a matter that would have resulted in formal review by the KCMCA after the initial inquiry. But there was no formal review, effectively indicating that the KCMCA found no falsification of documents by plaintiff. Therefore, according to plaintiff, the trial court erred in ruling that plaintiff offered no evidence to show that defendant's reason for the discharge was a mere pretext for unlawful retaliation.

In support of her position, plaintiff relies on the deposition testimony of Dr. William Fales of the KCMCA. Specifically, plaintiff focuses on pages 47 and 48 of Dr. Fales's

---

[3] *McDonnell Douglas Corp v Green*, 411 US 792, 93 S Ct 1817, 36 L Ed 2d 668 (1973); *Texas Dep't of Community Affairs v Burdine*, 450 US 248, 101 S Ct 1089, 67 L Ed 2d 207 (1981).

deposition transcript, which pages were attached to plaintiff's response to defendant's motion for summary disposition.[4] Dr. Fales testified, in pertinent part, as follows:

> *A*. I would be concerned about any falsification of a record relating to the process, whether it's a primary document from the patient encounter or it's a statement generated by the individual parties describing their involvement in the incident.
>
> *Q*. And if the medical record were falsified, that would be grounds, in your opinion, in your practice to trigger a more formal review?
>
> *A*. That would be grounds for triggering a more formal review. That said, it has not, fortunately, been something we've had to do on any recurring basis. I can't remember if or when I've had to deal with a falsified medical record from EMS.

From this testimony, plaintiff extrapolates that the KCMCA found that there was no falsification of documents by plaintiff, otherwise a formal review would have been initiated.

Before defendant moved for summary disposition, it had filed a motion for a protective order to enforce Michigan's peer-review privilege relative to KCMCA proceedings and Dr. Fales. The trial court entered a partial protective order, ruling that there was "good cause for the issuance of a protective order regarding the peer-review protected information considered by the . . . KCMCA[], the proceedings, reports, findings, or conclusions of KCMCA, the records, data, and knowledge collected for or by KCMCA, and the deposition testimony of Dr. William Fales regarding the KCMCA's review of patient care as it relates to this case." The trial court further ruled:

> Plaintiff may not introduce the testimony of Dr. William Fales (deposition or otherwise) or other evidence regarding any proceedings, reports, findings, or conclusions of KCMCA, and Plaintiff similarly may not introduce evidence regarding the records, data, and knowledge collected for or by KCMCA in connection with the review of patient care provided by Plaintiff as it relates to this case.
>
> [P]laintiff may introduce evidence that Defendant provided information to the KCMCA, and she may also introduce evidence regarding her current license status with the State of Michigan.

In light of this order, it certainly does not appear that plaintiff was even permitted to rely on any deposition testimony by Dr. Fales for purposes of summary disposition or otherwise. This is consistent with the trial court's rejection of plaintiff's summary disposition argument that

---

[4] Plaintiff also cites other pages of the transcript of Dr. Fales's deposition, but she failed to attach them to her brief in response to defendant's motion for summary disposition.

she was exonerated by the KCMCA, with the court noting that any discussion of KCMCA proceedings was limited to showing that information was provided to the KCMCA and that plaintiff's license was thereafter unaffected. And plaintiff has not presented an appellate challenge to the trial court's partial protective order.

Moreover, even if Dr. Fales's deposition testimony is considered, it does not stand for the proposition plaintiff forwards. Dr. Fales simply indicated that, generally speaking, falsification of a medical record would trigger a more formal review. He did not testify that the KCMCA specifically examined whether plaintiff had engaged in falsification of records or that the KCMCA had determined that there was no falsification in plaintiff's case. Dr. Fales did testify that the KCMCA does not make employment decisions in cases that come before the KCMCA. Further, defendant's director of operations averred in his affidavit that the "KCMCA did not (and could not) evaluate whether [plaintiff] complied with the MACC policy, whether she falsified records, or whether she was receptive to counseling." When plaintiff herself was asked whether Dr. Fales told her that she did not falsify a patient care record, plaintiff responded, "No. There was no discussion of that." Even in regard to the alleged violation of the MACC policy implemented by defendant, the fact that the KCMCA did not take any action against plaintiff's license could not establish a question of fact on the matter of the policy violation, as plaintiff fails to argue or show that there is a necessary correlation between relevant licensing criteria and the exercise of the MACC policy. Additionally, there is no evidence that the KCMCA determined that plaintiff had not violated defendant's MACC policy.[5]

In sum, we reject plaintiff's argument that in relation to the KCMCA investigation, the trial court improperly made conclusions as to disputed facts and failed to view the evidence in a light most favorable to plaintiff.

Plaintiff next contends that she established a prima facie case of retaliatory discharge under the WDCA. Her argument, however, tends to wander, discussing prima facie case principles interchangeably with pretext principles, which are two separate and distinct components of the *McDonnell Douglas/Burdine* burden-shifting framework. Ultimately, the asserted evidentiary bases for plaintiff's position are that: (1) the reason for the discharge was false given that the KCMCA effectively cleared plaintiff of falsifying records; (2) defendant did not impose a less severe adverse employment consequence where termination was unjustifiably harsh under the circumstances; (3) plaintiff did not have any negative marks on her employment record before her work injury; (4) falsification could not be shown "merely because one co-employee did not hear a call out during a diverting emergency medical situation", and (5) the termination occurred in close temporal proximity to protective activity. For purposes of identifying the "protected activity," plaintiff focuses on her action in filing a petition for mediation or hearing with the workers' compensation bureau on October 11, 2016, for which

---

[5] As is evident by our discussion, we reject plaintiff's argument that the only basis for the termination was falsification of records. The notice of termination cited multiple grounds.

notice was mailed to defendant on October 31, 2016—only about a month before the termination.[6]

First, for the reasons discussed earlier, we reject that part of plaintiff's argument that relies on alleged implications arising from the KCMCA proceedings; those purported implications were too tenuous, not adequately supported, and did not controvert the evidence that plaintiff falsified records and violated the MACC policy. With respect to plaintiff's argument that defendant terminated her instead of imposing a less severe punishment commensurate to her conduct, we note that the grounds defendant relied on for termination, mainly falsification of records and violation of the MACC policy which was implemented to safeguard patients, easily justified termination. And we thus fail to see how plaintiff's argument has any relevant bearing on causation or pretext.

In regard to plaintiff's contention that she did not have any negative marks on her employment record before her work injury, we find this to be patently untrue. Before she hurt her knee injury, there had been multiple documented incidents regarding conflicts between plaintiff and her coworkers and her questionable administration of medications. Next, we address plaintiff's argument that falsification could not be shown "merely because one co-employee did not hear a call out during a diverting emergency medical situation." This woefully undeveloped argument cannot overcome, as a matter of law, the overwhelming evidence that plaintiff violated the MACC policy during the November 21, 2016 incident, provided false information to her employer about the incident, and falsified records.

We are left with plaintiff's argument that the termination occurred in close temporal proximity to protective activity thereby creating a factual question on causation and/or pretext. In *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003), our Supreme Court held:

> Although the employment actions about which plaintiff complains occurred after his report to the police, such a temporal relationship, standing alone, does not demonstrate a causal connection between the protected activity and any adverse employment action. Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed. . . . Plaintiff must show something more than merely a coincidence in time between protected activity and adverse employment action. [Citations omitted.]

Given this pronouncement by our Supreme Court and considering that, ultimately, temporal proximity is plaintiff's lone viable argument, we conclude that the trial court did not err in granting defendant's motion for summary disposition.

---

[6] We also note that it does appear that defendant actually received the notice in early November 2016.

In sum, plaintiff's cause of action for retaliatory discharge under the WDCA fails, where she did not create a genuine issue of material fact with respect to the "causal connection" element of a prima facie case and relative to showing that defendant's legitimate, non-retaliatory reasons for discharge were pretextual, assuming adequate evidence of causation.

Finally, plaintiff maintains that the trial court erred in granting summary disposition of her claim for retaliatory discharge based on the request for no-fault insurance benefits. Even were there such a cause of action in Michigan, we conclude the claim fails because, as a matter of law, plaintiff cannot establish the requisite causation for the reasons expressed above.[7]

We affirm. Having fully prevailed on appeal, defendant is awarded taxable costs pursuant to MCR 7.219.

/s/ Jane E. Markey
/s/ Michael J. Kelly
/s/ Brock A. Swartzle

---

[7] We would also note that the termination did not occur in close temporal proximity to plaintiff's request for no-fault benefits.